## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

HILARY GARCIA, individually, and on
behalf of others similarly situated,

  Plaintiff,

v.

GENISYS CREDIT UNION and DOES 1
through 100,

  Defendants.

Case No.:

Honorable:

---

## CLASS ACTION COMPLAINT

---

Plaintiff Hilary Garcia ("Plaintiff"), by her attorneys, hereby brings this class and representative action against Genisys Credit Union and DOES 1 through 100 (collectively "GCU" or "Defendant").

## <u>NATURE OF THE ACTION</u>

1. All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or her counsel.  Allegations pertaining to Plaintiff or her counsel are based upon, *inter alia*, Plaintiff or her counsel's personal knowledge, as well as Plaintiff or her counsel's own investigation.  Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2. This is a class and representative action brought by Plaintiff to assert claims in her own right, and in her capacity as the class representative of all other persons similarly situated, and in her capacity as a private attorney general on behalf of the members of the general public.

GCU wrongfully charged Plaintiff and the Class Members overdraft fees and Non-Sufficient Funds fees.

3.     This class action seeks monetary damages, restitution, and injunctive relief due to, *inter alia*,  GCU's policy and practice of assessing an overdraft fee or Non-Sufficient Funds Fee ("NSF fees") on transactions when there was enough money in the checking account to cover (pay for) the transactions presented for payment.  The charging of such overdraft and NSF fees breaches GCU's contract with its members, who include Plaintiff and the members of the Class. This class action also seeks monetary damages, restitution, and injunctive relief due to GCU's policy and practice of charging multiple NSF fees on the *same* electronic item, a practice which also violates GCU's contract with its members, who include Plaintiff and the members of the Class.

4.     The charging for such overdraft fees also violates federal law.  Because GCU failed to describe its actual overdraft service in its Opt-In Agreement by, *inter alia*, failing to describe accurately in its Opt-In Agreement the actual method by which GCU calculates its overdraft fees, and because GCU also violated or did not fulfill other prerequisites of Regulation E (12 C.F.R. §§1005.17 *et seq*.) of the Electronic Fund Transfer Act (15 U.S.C.A. §§ 1693 *et seq*.) before being allowed to charge overdraft fees, GCU was prohibited from assessing overdraft fees for automated teller machine (ATM) and non-recurring debit card transactions (12 C.F.R. §1005.17(b)(1)(i)), but GCU did so anyway.

## **PARTIES**

5.     Plaintiff is a resident of Westland, Michigan and was a member of GCU at all times relevant to the class action allegations.

6.     Based on information and belief, Defendant GCU is and has been a federally

chartered credit union with its headquarters located in Auburn Hills, Michigan.  GCU is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)).

7.      Without limitation, defendants DOES 1 through 100, include agents, partners, joint ventures, subsidiaries and/or affiliates of GCU and, upon information and belief, also own and/or operate GCU branch locations.  Each of defendants DOES 1 through 100 is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)).  As used herein, where appropriate, the term "GCU" is also inclusive of Defendants DOES 1 through 100.

8.      Plaintiff is unaware of the true names of defendants DOES 1 through 100. Defendants DOES 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against defendants DOES 1 through 100 when the true names are ascertained, or as permitted by law or by the Court.

9.      There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that the named defendants effectively operate as a single enterprise, or are mere instrumentalities of one another.

10.      At all material times herein, each defendant was the agent, servant, co-conspirator and/or employer of each of the remaining defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants, and ratified and approved the acts of the other defendants.  However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

11.     Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

12.     As to the conduct alleged herein, each act was authorized, ratified or directed by Defendant's officers, directors, or managing agents.

## VENUE AND JURISDICTION

13.     This Court has subject matter jurisdiction over this case pursuant to, *inter alia*, 28 U.S.C. § 1331.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, *inter alia*, Defendant is a resident of this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

15.     GCU is a credit union with approximately 29 branches in Michigan with over 210,000 members, and holding approximately $2.6 billion in assets.  GCU offers its consumer banking customers a checking account.  One of the features of a GCU checking account is a debit card, which can be used for a variety of transactions including the purchasing of goods and services.  In addition to receiving a debit card, other features of a GCU checking account include: the ability to write checks; withdraw money from ATMs; schedule Automated Clearing House (ACH) transactions (certain recurring payments); and, other types of transactions that debit from a checking account.

16.     In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), GCU assesses overdraft fees and NSF fees to customer accounts when it claims to have determined that a customer's account has been overdrawn.

17.     Overdraft fees and NSF fees constitute the primary fee generators for banks and credit unions. In 2009 alone, banks generated an estimated $37 billion from overdraft fees on debit purchases and ATM transactions. While credit unions portray themselves to customers as more overdraft and fee friendly than banks, a 2015 study conducted by Moebs Services confirmed that the median overdraft fees charged by credit unions are not statistically significantly less than the median overdraft fees charged by banks. For credit unions such as GCU, overdraft fees and NSF fees are a major source of revenue and a profit center. According to a 2010 report by Georgetown University Law Professor Adam Levitin, overdraft fees comprise 6% to 7% of the gross revenue of credit unions. (Filene Research Institute Report, *Overdraft Regulation: A Silver Lining In The Clouds*? Filene Research Institute 2010.)

18.     The high cost of an overdraft fee is usually unfairly punitive. In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their account by mistake. (May 2012 Pew Charitable Trust report entitled "*Overdraft America: Confusion and Concerns about Bank Practices,*" at p. 4). More than 60% of the transactions that resulted in a large overdraft fee were for less than $50. (June 2014 Pew Charitable Trust report entitled "*Overdrawn,*" at p. 8). More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program (*id*. at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee. (*Id*. at p. 10).

19.     Unfortunately, the customers who are assessed these fees are the most vulnerable

customers.  Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees.  (*Id*. at p. 1).  A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old.  (*Id*. at p. 3).  More than 50% of the customers assessed overdraft fees earned under $40,000 per year.  (*Id*. at p. 4).  Non-whites are 83% more likely to pay an overdraft fee than whites.  (*Id*. at p. 3).

20.     As a result of banks and credit unions taking advantage of millions of customers through the unfair practice of charging overdraft fees through methodologies that maximize the possible number of expensive overdraft fees to be charged, there has been a substantial amount of litigation over the past few years. The outcome of these cases has predominantly fallen in favor of plaintiffs with the banks and credit unions repaying their customers over one billion dollars for the unlawfully assessed overdraft fees by way of jury verdicts and settlements.[1]

21.     The federal government has also stepped in to provide additional protections to customers with respect to abusive overdraft policies.  In 2010, the Federal Reserve Board enacted regulations giving financial institutions the authority to charge overdraft fees on ATM and one-time debit card transactions only if the institution first obtained the affirmative consent of the customer to do so. (12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule")).

22.     To qualify as affirmative consent, the Opt-In Agreement must include, but is not limited to, the following:

- The customer must be provided the overdraft policy, including the dollar amount of any fees that will be charged for an overdraft, and the maximum number of fees that can be assessed on any given day (if there is

---

[1] http://files.consumerfinance.gov/f/documents/CFPB_Arbitration_Agreements_Notice_of_Proposed_Rulemaking.pdf, at p. 74-75.

no maximum, that fact must be stated);

- The financial institution must state whether alternatives, such as linking the checking account to a secondary account or line of credit, are available.

- The opt-in consent must be obtained separately from other consents and acknowledgements;

- The consent cannot serve any purpose other than opting into the overdraft program;

- The consent cannot be a pre-selected checked box;

- The financial institution may not provide different terms for the account depending on whether the customer opted in to the overdraft program.

If the financial institution does not obtain proper, affirmative consent from the customer that meets all of the requirements of Regulation E's Opt-in Rule, including fulfilling each of the above requirements, then it is not permitted to charge overdraft fees on ATM and one-time debit card transactions.  On information and belief, GCU did not fulfill these prerequisites.

23.    Further, at all relevant times, GCU has had an overdraft program in place for assessing overdraft fees which, *inter alia*, is  contrary to the express and implied terms of its contract with members.

24.    There are three balances in an account: the "balance;" the "collected available balance;" and, the "artificial available balance."  The "balance" (sometimes called "actual balance" or "ledger balance") is the money in the account, without deductions for holds on pending transactions or on deposits.  It is the official balance of the account.  It is the balance provided to the customer in monthly statements, which is the official record of activity in the

account. It is the balance used to determine interest on deposits and any minimum balance requirements. Further, based on information and belief, it is the balance which is used by Defendant GCU to report its deposits to regulators, shareholders and the public. It is the balance provided to regulators in call reports and reserve reports. It is the balance used in financial reports to shareholders and the balance used for internal financial reporting. It is the balance used by credit reporting agencies in providing credit ratings of GCU.

25. The "collected available balance" is the "balance" less holds placed on certain deposits pursuant to the financial institution's "Funds Availability Policy" ("FAP"). Regulation CC (12 CFR part 229) establishes maximum permissible hold periods for checks and other deposits and all financial institutions are required by it to have an FAP.

26. The "artificial available balance" as used by GCU during the relevant class periods is a completely different calculation than the "collected available balance." Although the "artificial available balance" has the words "available balance" in it like the "collected available balance" has, the "artificial available balance" is an accounting gimmick which takes the "collected available balance" and then further deducts from it pending debit card transactions which have not yet posted (and which might or might not ever post), meaning the money is still in the account of the credit union member. In other words, the "artificial available balance," unlike the "collected available balance," deducts not only holds that GCU has placed on deposits, but also additionally deducts holds which GCU has placed on pending debit card transactions. GCU does this so that it may increase the overdraft fees and NSF fees it charges its members. There is no requirement to use the "artificial available balance," and during the class period, GCU had no contract with its members that it would use the "artificial available balance" as opposed to the "collected available balance" or "balance" for purposes of assessing overdraft or

NSF fees.

27.     Not only is the practice of using this "artificial available balance" rather than the "balance" or "collected available balance" to determine whether a transaction results in an overdraft or NSF fee contrary to GCU's contract with its members during the class period, but such practices have resulted in GCU improperly charging unlawful overdraft and NSF fees. GCU created this "artificial available balance" accounting gimmick to increase overdraft and NSF fees it charged its members.

28.     GCU entered into a written contract with Plaintiff and the other Class Members titled "Account Contract & Truth-In-Savings Disclosure" (hereinafter referred to as the "Account Contract") effective April 1, 2013, which is attached hereto as Exhibit 1. The Account Contract, on page 2 in a section entitled "OVERDRAFT POLICY" expressly states an overdraft occurs if, "…[t]he account does not contain sufficient collected funds." Although likely unbeknownst to an ordinary consumer, when GCU stated it would use "collected funds" by which to determine whether to assess an overdraft fee, and although discovery on this issue will be required, it appears GCU meant what is defined in this Complaint as the "collected available balance," meaning the balance less holds placed on deposits. But further ambiguity and confusion is caused by GCU's use of this term "collected funds" for determining when an overdraft occurs because on page 1 of this same Account Contract it states the following about non-cash deposits:

`DEPOSITS -` All non-cash payments received in this account will be given provisional credit until collection is final. This means we can revoke the credit and charge it back to your account if an item you deposit is returned unpaid. We are not responsible for transactions initiated by mail or outside depository until we actually record them.

29.     This contract term does not state holds will be placed on deposits, meaning that the "collected available balance" in a member's account should be the same as the "balance," unless, as stated in the Account Contract, *GCU has taken action to "revoke the credit and charge*

*it back to [the] account*." Despite GCU therefore being required to use the "balance" to determine whether to assess an overdraft fee rather than using the "collected available balance," on information and belief, not only did GCU not use the "balance" to determine whether to assess overdraft fees, but GCU also did not even use the "collected available balance" to determine whether to assess overdraft fees, and instead used the "artificial available balance," the accounting gimmick which would result in GCU imposing substantially greater overdraft fees on its members than if it used the "balance" or "collected available balance" to determine whether to impose an overdraft fee.

30.     GCU's Account Contract also describes a "Courtesy Pay" program. On page 2, in direct violation of Regulation E's requirement that an affirmative opt-in be obtained before an overdraft fee may be assessed, GCU instead states the opposite, that being that if a member does not wish to be covered by Courtesy Pay, the member may "opt-out" of this program, and should "Contact a Member Service Representative" to do so:

> If you do not want us to pay overdrafts from your account using Courtesy Pay, you have the option of Opting out of this program. Contact a Member Service Representative at (248)322-9800 x 5 or (800)521-8440 ext. 5, or at your local branch.

On information and belief, this is an additional violation of the Regulation E requirements not complied with by GCU before being allowed to charge its members overdraft fees, using an opt-out system rather than an opt-in system. Discovery will be necessary to determine the number of class members to whom GCU did this, and the extent of overdraft fees collected from GCU members who were opted-in to Courtesy Pay in this manner.

31.     Regulation E also states a financial institution may not "provide different terms for the account depending on whether the customer opted in to the overdraft program." Despite this prohibition, and in another violation of Regulation E, on page 2 of its Account Contract,

GCU states that if a member authorizes Courtesy Pay, the Courtesy Pay will cover overdrafts on the member's "checks, bill pay, and electronic and ACH transactions":

> **Types of Transactions that Courtesy Pay may cover:** Courtesy Pay, when authorized on your account, may cover checks, bill pay, electronic and ACH transactions when funds are not available in your account to cover these items. Transactions authorized with a merchant as a reoccurring debit card transaction may be covered by Courtesy Pay. When authorization is provided, coverage can also include Debit Card transactions.

In other words, GCU was stating in its Account Contract it would do exactly that which Regulation E prohibited, linking the payment of these other overdrafting types of transactions to the "opting-in" to Courtesy Pay for the transactions covered by Regulation E, those being non-recurring debit card transactions and ATM withdrawals.  On information and belief, GCU would normally reject these other types of transactions and return them as unpaid rather than pay them unless the GCU member had opted-in to Courtesy Pay.  Discovery will be necessary to determine the number of class members to whom GCU did this, and the extent of overdraft fees collected from GCU members who were opted-in to Courtesy pay in this manner.

32.     GCU was required by Regulation E to obtain the affirmative consent of its members before being allowed to charge them an overdraft fee on a non-recurring debit card transaction or ATM withdrawal.  The importance of Regulation E is highlighted by the fact that the Consumer Financial Protection Bureau's study of actual practices found that: 1) ATM and debit card transactions are by far the most frequent transactions that occur; 2) overdraft fee policies entail expensive fees at very little risk to the financial institutions; and 3) opted-in accounts have seven times as many overdrafts that result in fees as not opted-in accounts.[2]

33.     GCU's Opt-In Agreement is a document entitled, "What You Need to Know about Overdraft and Overdraft Fees" (hereafter referred to as the "Opt-In Agreement").  It defines an "overdraft" as follows: "An overdraft occurs when you do not have enough money

---

[2] http://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf

based on the available balance in your account to cover a transaction, but we pay it anyway."

The Opt-In Agreement does not state what "available balance" means, and does not differentiate

between "collected available balance" and "artificial available balance."  Adding further

ambiguity to the term, as stated in Paragraph 29 of this Complaint, the Account Contract states

non-cash deposits will be credited immediately and does not reference any holds at all, only that

a credit may be "revoked." Therefore, the most reasonable interpretation of "available balance"

would be that it is referring to all of the money in the account.  The Opt-In Agreement does not

in any way state that there will be deductions made from the money in the member's account

arising from holds placed on pending debit card transactions to create a different "artificial

available balance," nor does the Opt-In Agreement state holds placed on deposits would lower

the amount of money in the account and create a "collected available balance" for purposes of

allowing an overdraft fee to be assessed.  Furthermore, because, *inter alia*, the Opt-In Agreement

does not describe GCU's actual overdraft practice, let alone in a  manner which is "clear and

readily understandable"  as required by 12 C.F.R. §205.4(a)(1), the Opt-In Agreement further

fails to comply with the requirements of Regulation E.

34.    In fact, on information and belief, GCU charges overdraft and NSF fees when

both the "balance" as well as the "collected available balance" contain as much or more money

than has been requested, but the "artificial available balance" does not.  GCU's practice of

charging overdraft and NSF fees, even when there is enough money in the account to cover a

transaction presented for payment is inconsistent with how GCU's Account Contract and Opt-In

Agreement expressly describe the circumstances under which overdraft or NSF fees are assessed.

35.    GCU also has an improper practice of charging multiple NSF fees for the same

electronic transaction.  GCU charges a $28 fee when an electronic item is first processed for

payment and GCU determines that there is not enough money in the account to cover the transaction (a practice that wrongfully uses the "artificial available balance" described above). GCU then charges an *additional* NSF fee if the same item is presented for processing again by the payee, even though the account holder took no action to resubmit the item for payment.  This violates the Account Contract, *inter alia*, at page 2 where GCU states that it will charge a fee per "item," and that it will charge an additional fee every time that same "item" is presented, and also where it states in that same sentence it will charge "a fee," not "multiple fees:"

> **Account Fees:** Whether we pay or return a non-sufficient fund **item**, your account will be assessed **a** fee, with either a Courtesy Pay charge or a non-sufficient funds charge but you will not be charged both fees. Please refer to the current fee schedule for the fee.  (Emphasis added.)

"Item" means a single item, and not "multiple items" or a "retry" attempt to process payment for the same electronic item a second or third time.  An electronic item reprocessed after an initial return for insufficient funds, especially through no action by the customer, cannot and does not fairly become a new, unique additional item for fee assessment purposes.  If more than one fee per "item" were allowed, this section of the contract would state it is "per presentment of item" and would state more than just the singular "a fee" would be charged for the same "item" if presented more than once even though it was the same "item."  Furthermore, although Plaintiff is unaware at this time whether the GCU's Schedule of Fees was ever served on Class Members in the manner required to make it effective, and this will require discovery, the Schedule of Fees also states that an NSF fee would only be charged as "$28 per item," and not "$28 per presentment of item."

36.    Other credit unions and banks which like GCU employ this abusive practice of charging multiple NSF fees for the same "item," unlike GCU know how to plainly and clearly disclose it.  For example, First Citizens Bank, engages in the same abusive practice as GCU but

at least expressly states:

> Because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item.

37.     Similarly, First Hawaiian Bank also engages in the same abusive practice as GCU, but discloses it, in all capital letters, as follows:

> YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A RETURNED ITEM FOR PAYMENT AND THAT MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION.

38.     Klein Bank similarly states:

> We will charge an NSF/Overdraft Fee as provided in this section regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.

39.     GCU provides no such disclosure, and in so doing, deceives its accountholders. GCU's practice of charging multiple NSF fees for a single electronic item is particularly egregious because, as described, GCU assesses such fees using an improper calculation of the balance available in a member's account (the "artificial available balance"), including causing additional fees and confusion and ambiguity.  GCU often charges an NSF fee improperly, and because of GCU's improper $28 deduction from a member's balance further GCU further decreases the "balance," it generates even more NSF fees or overdraft fees.

40.     Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contract.

41.     Meanwhile, Plaintiff and the Class Members could not have anticipated the harm resulting from Defendant's practice throughout the class periods.  The money in the account, without deductions for holds on pending transactions or on deposits, as already stated, is known as the "balance," and is considered the official balance of the account.  It is the balance provided

14

to the customer in monthly statements, which is the official record of activity in the account.  It is the balance used by GCU to determine interest on deposits and any minimum balance requirements, the balance used by GCU to report its deposits to regulators, shareholders and the public, the balance provided to regulators in call reports and reserve reports, and the balance used in financial reports to shareholders and the balance used for internal financial reporting.  It is reasonable therefore to understand that all of the money in a member's account was available for use to pay debit card or other transactions before an overdraft or NSF fee would be assessed.

42.     Contrary to the promises in the Account Contract, GCU's policy and practice during relevant times of the class period was to ignore whether there was money in the account or a negative balance, and even to ignore whether there were sufficient "collected funds" available, *i.e.*, the "collected available balance."  Instead, on information and belief, GCU's policy and practice was at all times relevant herein to assess overdraft fees and NSF fees based on the artificial internal calculation by which it deducts holds it has placed on pending debit card transactions and deposits, the "artificial available balance," rather than use the actual money in the account as required by the Account Contract without deduction for pending debit card transactions, or holds placed on deposits, to determine whether an overdraft or NSF has occurred for purposes of assessing an overdraft or NSF fee.

43.     Under the Account Contract and Opt-In Agreement, although Plaintiff disputes it, the only funds which even *arguably* might due to ambiguity be considered not "available" for purposes of overdrafts or NSFs were those which were subject to temporary holds immediately upon deposit pursuant to the institution's Funds Availability Policy, meaning "collected available balance," although that would be a less than reasonable interpretation here since the Account Contract states overdrafts are determined on "collected funds" while at the same time stating on

15

page 1 that deposits are credited immediately unless revoked.  But not even *arguably* could funds on which holds were placed due to pending transactions, *i.e*., "artificial available balance," be utilized as opposed to "collected available balance."   Although it is Plaintiff's position that during the class period GCU, under its contractual terms with the Class Members, could only charge an overdraft fee or NSF fee if the balance in the account became negative without regard to any deductions for holds on deposits, or any other holds, the absolute best case scenario for GCU is that there might be an arguable ambiguity in the contract which might have allowed GCU in certain circumstances to place holds on recently deposited, *i.e*., uncollected, funds in the account, and deduct those funds from the account balance in determining whether or not an overdraft or NSF has occurred (meaning use of the "collected available balance)." But in no case was GCU even arguably permitted to deduct from the account on which holds had been placed for transactions which had not yet gone through (meaning use of the "artificial available balance").  This was not contracted.

44.    In the alternative, GCU violated its own Funds Availability Policy during the class period because, *inter alia*, on page 1 of the Account Contract that section clearly states credits will immediately issue upon deposit subject only to being "revoked," and GCU expanded it, in practice, to have a different system for crediting deposits than in the Account Contract to include holds placed on funds earmarked for pending transactions.

45.    Unlike GCU, numerous other financial institutions' account contracts explain exactly how those institutions place holds on pending debit card transactions and how those holds reduce the amount of funds which are consulted to determine when overdrafts occur.  For example, the account contract of Affinity Federal Credit Union states, in bold, that "[a] temporary debit authorization hold affects your account balance."  The language beneath this

header explains that "the amount of funds in your account available for other transactions will be

reduced by the amount of the temporary hold." Likewise, GTE Federal Credit Union's account

contract contains the following language since June 2016:

> YOUR CHECKING ACCOUNT BALANCE: Your available balance is the amount of money in your account that is available to you to use without incurring an overdraft or NSF fee. The available balance takes into account things likes holds placed on deposits and pending transactions (such as pending debit card purchases) that the Credit Union has authorized but have not yet posted to your account…"

Logix Credit Union has also adopted an account contract which specifically states debit holds

can cause overdrafts:

> "The available balance takes into account things like holds placed on deposits and payments that have been authorized but have not yet posted to your account (such as pending debit card purchases). For example, assume you have an actual balance of $50 and an available balance of $50. If you were to swipe your debit card at a restaurant to buy lunch for $20, then that merchant could ask us to pre-authorize the payment. In that case, we will reduce your available balance by $20. Your actual balance would still be $50 because this transaction has not yet posted, but your available balance would be $30 because you have committed to pay the restaurant $20. When the restaurant submits the transaction to us (which could be a few days later), we will post the payment transaction to your account and your actual balance will be reduced by $20."

Baxter Credit Union has an account contract which states that "[a]vailable balance is used to

determine when there are insufficient funds to pay an item presented for payment form the

account" and describes the available balance as "generally equal to the actual balance, less the

amount of any holds placed on recent deposits, holds for other reasons, and holds for pending

transactions (such as pending debit card purchases) that the Credit Union has authorized but that

have not yet posted to your account." Southland Credit Union's account contract also states that

for purposes of determining whether to assess an overdraft fee it, "[t] akes into account factors

such as holds placed on deposits and pending transactions (such as pending debit card purchases)

that the Credit Union has authorized but that have not yet posted to your account." Similarly,

State Employees Credit Union of Maryland discloses that for purposes of assessing an overdraft

fee it, "[t] takes into account things such as holds placed on deposits and decreases in your Available Balance (such as pending debit card purchases) that you initiated and SECU has authorized but that have not yet posted to your account." MidFlorida Credit Union has put forward a separate Overdraft Agreement which states that it, "[t]akes into account things like holds placed on deposits and pending transactions (such as pending debit card purchases) that the Credit Union has authorized but that have not yet posted to your account." Point Loma Credit Union explains in its account contract that for purposes of assessing overdraft fees "[a]ny purchases, holds, fees, other charges, or deposits made on my account that have not yet posted will not appear in my actual balance." San Diego County Credit Union's account contract states that in determining whether an overdraft fee will be assessed against a member, "[w]e will consider all transactions that have posted to your account, any holds that may be in place on deposits you have made, and pending transactions (such as pending debit card purchases) that the Credit Union has authorized but that have not yet posted to your account." That contract also contains a section on authorization holds, titled, "Authorization Holds for Debit Card Transactions," which states, "[w]e generally place a temporary hold against some or all of the funds in the account linked to your debit card if and when an authorization request is obtained," and that "[t]he amount of the authorization hold will be subtracted from your available balance." In contrast to these account contract, and dozens of others across the country, GCU's Account Contract states no such thing, not even remotely.

46.     Further, with regard to the Opt-In Agreement, Plaintiff anticipates that GCU might try to argue that it was required to use the language it used —"[a]n overdraft occurs when you do not have enough money based on the available balance in your checking account to cover a transaction, but we pay it anyway"—by Regulation E. But Regulation E contains no such

requirement.  In fact, many banks and credit unions which, like GCU use an "artificial available balance" method to determine when accounts are overdrafted, have adopted language in their Opt-In Agreements which reflect that Regulation E does not prevent explaining what "available balance" means, and explained what they mean when they use the term "available balance." For instance, TD Bank's Opt-In Agreement, which is attached hereto as Exhibit 2, states as follows: "An overdraft occurs when your available balance is not sufficient to cover a transaction, but we pay it anyway.  **Your available balance is reduced by any 'pending' debit card transactions (purchases and ATM withdrawals), and includes any deposited funds that have been made available pursuant to our Funds Availability Policy**."  (Emphasis added.)  Similarly, Communications Federal Credit Union's Opt-In Agreement, which is attached hereto as Exhibit 3, states, "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, or the transaction exceeds your available balance, but we pay it anyway.  **'Available Balance' is your account balance less any holds placed on your account.**"  (Emphasis added.) Attached as Exhibit 4 is the Opt-In Agreement for San Diego County Credit Union, and also unlike Defendant, recognizing that "available balance" is at best an ambiguous term, explains on that same page, as follows: "In determining your available balance **we will consider** all transactions that have posted to your account, **any holds that may be in place on deposit you have made and pending transactions (such as pending debit card purchases) that have been authorized but not yet posted to your account**."  (Emphasis added.) Attached as Exhibit 5 is the Opt-In Agreement for EECU, another credit union of similar size to Defendant, and it explains for five-pages on the same form requiring signature pursuant to Regulation E for overdraft coverage, including on page two that, " My available balance takes into account holds that have been placed on deposits and pending transactions (such as pending debit card

transactions) that the credit union has authorized but that have not yet posted to my account. **In other words, the available balance is my actual balance less any pending ATM withdrawals, debit card purchases, ACH transaction, checks being processed or other pending withdrawals from my account and less any deposits that are not yet available due to the credit union's funds availability policy.**" (Emphasis **not** added.)  There are countless other examples of financial institutions explaining in the Opt-In Agreement accurately on what basis the financial institution will impose overdraft fees.  But GCU is not one of them.  GCU could have, but did not, accurately described its overdraft program in its Opt-In Agreement, and violated  Regulation E by charging any overdraft fees whatsoever on ATM and debit card transactions, given that it did not accurately describe its overdraft program in the required notice.

47.     The Consumer Finance Protection Bureau ("CFPB"), in a recent Federal Interagency Compliance Discussion regarding improper overdraft fees, condemned exactly the sort of conduct being challenged by Plaintiff in this lawsuit, and called what Defendant was doing here during the relevant class period an "Unfair Practice":



(Excerpts from Interagency Overdraft Services Consumer Compliance Discussion, dated Nov. 9,

2016).

48.     As shown, the CFPB has actually condemned as deceptive one of the very practices at issue in this case.

49.     Plaintiff did not and could not have, exercising reasonable diligence, discovered both that she had been injured and the actual cause of that injury until she met with her attorneys in 2019.  While Plaintiff understood that she was assessed fees, she did not understand the cause of those fees until 2019 because Defendant hid its actual practice from its members by describing a different practice in its contract and other materials disseminated to its members. This not only reasonably delayed discovery, but Defendant's affirmative representations and actions also equitably toll any statute of limitations, and also additionally equitably estop Defendant.

50.     Therefore, Plaintiff, on behalf of herself and all others similarly situated, seeks relief as set forth below.

51.     Plaintiff and the Class Members were harmed by Defendant's policy and practice of charging overdraft fees when there was money in a member's account to cover the transaction, and also when GCU charged an NSF fee more than once for the same "item."  By doing so, GCU breached its contract with Plaintiff and the absent Class Members.  It will be necessary to obtain Defendant's records to determine each instance of such a wrongful overdraft fee, NSF fee, or repeat NSF fee on the same item, but on information and belief Plaintiff and the Class Members were subjected to such.   Plaintiff has a reasonable belief that a complete review of Plaintiff's and GCU's records will show multiple instances in which GCU improperly charged Plaintiff overdraft fees and NSF fees for transactions despite the fact that Plaintiff had enough money in her account to cover the transactions. Plaintiff also has a reasonable belief that a complete review of Plaintiff's and GCU's records will show multiple instances in which Plaintiff was charged

multiple NSF fees for the same electronic transaction, even though GCU's Account Contract states that a fee will only be charged when "an item" cannot be paid because there is not enough money in the member's account.  A resubmission of the same item or transaction does not create a new "item", and cannot result in an additional NSF fee, pursuant to GCU's own contract.

52.     Moreover, the assessment and unilateral taking of improper overdraft and NSF fees further reduces the balance and amount of funds in the account, resulting in and aggressively causing subsequent, otherwise non-overdraft transactions to be improperly treated as transactions for which GCU assesses further overdraft or NSF fees.  This practice was deemed to be deceptive and substantially harmful to customers by the CFPB, which made the following conclusions in its studies:

> Examiners also observed at one or more institutions the following sequence of events after the institutions switched balance-calculation methods: a financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

(Supervisory Highlights, Winter 2015, a pp. 8-9.)   A complete evaluation of GCU's records is necessary to determine the full extent of Plaintiff's harm from this practice.

53.     Additionally, because the Opt-In Agreement did not describe GCU's actual overdraft service, let alone in a "clear and readily understandable" manner as required by 12

C.F.R. §205.4(a)(1), and/or because it contained other deficiencies, including but not limited to those set forth, *inter alia*, in Paragraphs 29, 30, and 31 of this Complaint, GCU violated Regulation E by charging overdraft fees on ATM and non-recurring debit card transactions. Because it failed to provide the full and accurate disclosures to Plaintiff required by Regulation E, GCU failed to obtain Plaintiff's fully informed consent as required by Regulation E in order for GCU to be authorized to charge such overdraft fees. Because GCU was not legally authorized to enroll Plaintiff into the program for non-recurring debit card and ATM transactions, GCU violated Regulation E when it assessed any overdraft fees against Plaintiff for non-recurring debit card and ATM transactions.

54.     Plaintiff was harmed by these practices when she was assessed overdraft fees and NSF fees when she should not have been. A complete evaluation of GCU's records is necessary to determine the full extent of Plaintiff's harm from this practice as well.

## CLASS ACTION ALLEGATIONS

55.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

56.     Plaintiff brings this case, and each of her respective causes of action, as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2) and (b)(3) on behalf of the following class.

57.     The "Class" is composed of three classes:

**The Account Balance Class:**

> **All United States residents who have or have had accounts with** GCU **who incurred an overdraft fee or NSF fee when the balance in the checking account was sufficient to cover the transaction at issue during the period**

> beginning six years preceding the filing of this Complaint and ending on the
> date the class is certified.

**The Regulation E Class:**

> All United States residents who have or have had accounts with GCU who
> incurred an overdraft fee or overdraft fees for ATM or non-recurring debit
> card transaction(s) during the period beginning August 15, 2010, and ending
> on the date the class is certified.

**The Repeat NSF Class:**

> All United States residents who have or have had accounts with GCU who
> incurred an NSF fee more than once for the same item during the period
> beginning six years preceding the filing of this Complaint and ending on the
> date the class is certified.

58.   Excluded from the Class are: (1) any entity in which Defendant has a controlling interest; (2) officers or directors of Defendant; (3) this Court and any of its employees assigned to work on the case; and (4) all employees of the law firms representing Plaintiff and the Class Members.

59.   This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to Federal Rule of Civil Procedure 23.

60.   **Numerosity** – The members of the Class are so numerous that a joinder of all members would be impracticable.  While the exact number of Class Members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes that the Classes are likely to include thousands of members based on the fact that GCU has approximately $2.6 billion in assets and operates approximately 29 branches in Michigan

with over 210,000 members.

61.     Upon information and belief, Defendants have databases, and/or other documentation, of its customers' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of GCU's members have been harmed by its practices and thus qualify as Class Members.  Further, the Class definition identifies groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications.

62.     **Commonality –** This action involves common questions of law and fact.  The questions of law and fact common to both Plaintiff and the Class Members include, but are not limited to, the following:

        a.     Whether, pursuant to the Account Contract, Defendant promised to Plaintiff and the Class Members that it would not charge an overdraft fee or NSF fee if there was enough money in the account to cover the transaction;

        b.     Whether, pursuant to the Account Contract, Defendant promised to Plaintiff and the Class Members that it would only charge "a" fee for an NSF "item" rather than charge repeat NSF fees each time the same "item" was presented for payment;

        c.     Whether Defendant breached the Account Contract by assessing overdraft fees or NSF fees for transactions when customers' checking accounts contained enough money to cover the transactions;

25

d.      Whether the language in the Account Contract was ambiguous;

e.      Whether the language in the Opt-In Agreement was ambiguous;

f.      Whether Defendant is liable under claims of breach of the covenant of good faith and fair dealing, unjust enrichment and money had and received; and

g.      Whether Defendant's conduct violated 12 C.F.R. § 1005.17.

63.    **Typicality** – Plaintiff's claims are typical of all of the members of the Class. The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class Members are substantially the same because all of the relevant agreements between Defendant and its customers, including the Account Contract and the Opt-In Agreement, were identical as to all relevant terms, and also because, *inter alia*, the challenged practices of charging customers for overdraft fees or NSF fees when there were sufficient funds in the accounts to pay for the transactions at issue, and of assessing multiple NSF fees for the same electronic item, are uniform for Plaintiff and all Class Members. Accordingly, in pursuing her own self-interest in litigating her claims, Plaintiff will also serve the interests of the other Class Members.

64.    **Adequacy** – Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained competent counsel experienced in class action litigation to ensure such protection. There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate. Plaintiff and his counsel intend to prosecute this action vigorously.

65.    **Predominance and Superiority** – The matter is properly maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because the common questions of law or

fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class Members.  Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter.  Because the injuries suffered by the individual Class Members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class Members to individually seek redress for Defendant's wrongful conduct.  Even if any individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court.  In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

66.     Plaintiff is not aware of any separate litigation instituted by any of the Class Members against Defendant.  Plaintiff does not believe that any other Class Members' interest in individually controlling a separate action is significant, in that Plaintiff has demonstrated above that her claims are typical of the other Class Members and that she will adequately represent the

Class.  This particular forum is a desirable forum for this litigation.  Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

67.     Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members.  Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices.  To the extent that any further notices may be required, Plaintiff anticipates the use of additional media and/or mailings.

68.     This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure in that:

a.   Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the Class format, prosecution of separate actions by individual members of the Class will create the risk of:

1.   Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

2.   Adjudication with respect to individual members of the Class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief

with respect to the Class as a whole.

b.  Common questions of law and fact exist as to the members of the Class and

predominate over any questions affecting only individual members, and a

class action is superior to other available methods of the fair and efficient

adjudication of the controversy, including consideration of:

1.  The interests of the members of the Class in individually

controlling the prosecution or defense of separate actions;

2.  The extent and nature of any litigation concerning controversy

already commenced by or against members of the Class;

3.  The desirability or undesirability of concentrating the litigation of

the claims in the particular forum; and

4.  The difficulties likely to be encountered in the management of a

class action.

## **FIRST CAUSE OF ACTION**
### **(Breach of the Account Contract)**

69.  The preceding allegations are incorporated by reference and re-alleged as if fully

set forth herein.

70.  Plaintiff and each of the Class Members entered into the Account Contract,

attached hereto as Exhibit 1, with Defendant covering the subject of overdraft and NSF fees.

This contract was drafted by and is binding upon Defendant.

71.  In the Account Contract, Defendant promised that GCU would assess overdraft or

NSF fees only when there were not "collected funds" in the account to cover "an item,"  and in

that same Account Contract defined funds as collected at the time they were deposited.  Nowhere

did the Account Contract state that GCU would deduct pending debit card transactions for purposes of determining whether sufficient funds existed for purposes of determining whether to assess an overdraft or NSF fee.

72.     Further, nowhere did the Account Contract state that GCU would assess an additional NSF fee every time an electronic item was presented for processing, or submitted as a "retry."  GCU wrongfully treated a "retry" as a new and separate "item" in violation of the terms of the Account Contract.

73.     Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

74.     Defendant breached the express and implied terms of the Account Contract by, *inter alia*, assessing overdraft or NSF fees when there were sufficient funds in the account to cover the transaction or transactions at issue, and by assessing multiple NSF fees for the same electronic transaction or item.

75.     As a proximate result of Defendant's breach of the Account Contract, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## SECOND CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

76.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

77.     Plaintiff and each of the Class Members entered into the Account Contract with

Defendant covering the subject of overdraft and NSF transactions, which is attached as Exhibit 1. This contract was drafted by and is binding upon Defendant.

78.     In the contract, Defendant promised that GCU would only assess overdraft fees or NSF fees when there was not enough money in the account to cover the transaction.  GCU also promised that it would only assess "a" fee for an NSF "item," not multiple fees every time the same "item" was presented.

79.     Further, good faith is an element of every contract.  Whether by common law or statute, all contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

80.     The material terms of the contract therefore included the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class Members' rights and benefits under the contract.

81.     Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

82.     Defendant breached the implied covenant of good faith and fair dealing based,

*inter alia*, on its practices of assessing fees when there was enough money in the account to cover the transaction, and of assessing multiple NSF fees for the same electronic item. Defendant had the unilateral power and could easily have avoided acting in this manner by simply changing the programing in its software to charge overdraft fees and NSF fees only when there really was not enough money in the account to cover the transaction in question.  Instead, Defendant unilaterally elected to and did program its software to create an accounting gimmick, the "artificial available balance," which would maximize its overdraft and NSF fees.  It also unilaterally implemented a policy which it controlled the charging of multiple NSF fees on the same attempted item.  In so doing, and in implementing its overdraft and NSF fee programs for the purpose of increasing and maximizing overdraft fees, Defendant executed its contractual obligations in bad faith, depriving Plaintiff and the Class Members of the full benefit of the contract.

83.     As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

### THIRD CAUSE OF ACTION
**(Unjust Enrichment/Restitution)**

84.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

85.     As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft and NSF fees.

86.     The Consumer Finance Protection Bureau has concluded that inadequate disclosure of the type of balance-calculation used to determine overdraft transactions and their

resultant fees that create additional overdraft fee harm constitutes an Unfair, Deceptive, or Abusive Acts or Practice. (CFPB Bulletin 2013-07[3], at p. 2 (defining Unfair, Deceptive, or Abusive Acts or Practices based on the FTC balancing test: "1) It causes or is likely to cause substantial injury to consumers; 2) The injury is not reasonably avoidable by consumers; and 3) The injury is not outweighed by countervailing benefits to consumers or to competition").

87.     Because Plaintiff and the Class Members paid the erroneous overdraft and NSF fees and repeat NSF fees assessed by Defendant, Plaintiff and the Class Members have conferred a benefit on Defendant, albeit undeservingly. Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred. Should it be allowed to retain such funds, Defendant would be unjustly enriched. Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

## FOURTH CAUSE OF ACTION
### (Money Had and Received)

88.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

89.     Defendant has obtained money from Plaintiff and the Class Members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

90.     As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff and the Class Members, and thus, this money should be refunded to Plaintiff and the

---

[3] http://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive-practices.pdf

Class Members.  Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

**FIFTH CAUSE OF ACTION**
**(Violation of Electronic Fund Transfer Act (Regulation E)**
**C.F.R. § 1005, *et seq*.  (authority derived from 15 U.S.C. § 1693, *et seq*.))**

91.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

92.     By charging overdraft fees on ATM and nonrecurring transactions, GCU violated Regulation E (12 C.F.R. §§1005, *et seq*.), whose "primary objective" is "the protection of consumers" (§1005.1(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act (15 U.S.C. §§1693 *et seq*.), the "EFTA"] (§1005.1(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

93.     Specifically, the charges violated what is known as the "Opt In Rule" of Reg E. (12 C.F.R. §1005.17.)  The Opt In Rule states:  "a financial institution *... shall not assess a fee or charge ...* pursuant to the institution's overdraft service, *unless* the institution:  (i) [p]rovides the consumer with a notice in writing [the opt-in notice]... *describing the institution's overdraft service*"  and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program. (*Id*.)  The notice "shall be clear and readily understandable." (12 C.F.R. §205.4(a)(1).)  To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description.  The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12

34

C.F.R. § 1005.17.  Furthermore, choosing not to "opt-in" cannot adversely affect any other feature of the account.

94.     The intent and purpose of this Opt-In Agreement is to "assist customers in understanding how overdraft services provided by their institutions operate .... by explaining the institution's overdraft service ... in a clear and readily understandable way"—as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Reg E.  *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).

95.     GCU failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution is permitted to assess overdraft fees against customers' accounts through an overdraft program for ATM and non-recurring debit card transactions.  GCU has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers in a "clear and readily understandable way" a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17.  GCU's opt-in method fails to satisfy 12 C.F.R. §1005.17 because, *inter alia*, it states that an overdraft occurs when there is not enough money in the account to cover a transaction in a manner different than it carried out.  Further, on information and belief, GCU made payment into overdraft of checks and ACH items and recurring debit card transactions contingent on "opting-in" to Courtesy Pay, another violation of Regulation E.  Further, on information and belief, GCU violated Regulation E's "opt-in" requirement in other ways, including, according to the Account

Contract, requiring individuals to opt-out if they did not want to be charged overdraft fees on Reg E transactions.

96.     As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions without obtaining affirmative consent to do so, GCU has harmed Plaintiff and the Class.

97.     Due to GCU's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

## PRAYER

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1.     For an order certifying this action as a class action;

2.     For compensatory damages on all applicable claims and in an amount to be proven at trial;

3.     For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

4.     For statutory damages;

5.     For an order enjoining the wrongful conduct alleged herein;

6.     For costs;

7.     For pre-judgment and post-judgment interest as provided by law;

8.     For attorneys' fees under the Electronic Fund Transfer Act, the common fund doctrine, and all other applicable law; and

9.     For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class Members demand a trial by jury on all issues so triable

Dated: November 18, 2019                    Respectfully submitted,

    /s/ *Philip J. Goodman*
Philip J. Goodman (P14168)
Of Counsel
Hubbard Snitchler & Parzianello, PLC
801 W. Ann Arbor Trail, Ste 240
Plymouth, MI 48170
248-760-2996
PJGoodman1@aol.com

Richard D. McCune, *Pro Hac Vice*
rdm@mccunewright.com
Emily J. Kirk
ejk@mccunewright.com
McCune Wright Arevalo, LLP
3281 East Guasti Road, Suite 100
Ontario, California 91761
Telephone:  (909) 557-1250
Facsimile:  (909) 557-1275

Taras Kick, CA Bar No. 143379*
Taras@kicklawfirm.com
THE KICK LAW FIRM, APC
815 Moraga Drive
Los Angeles, California 90049
Telephone: (310) 395-2988
Facsimile: (310) 395-2088
Taras@Kicklawfirm.com
*Pro Hac Vice* applications to be submitted

Attorneys for Plaintiff Hilary Garcia and the
Putative Class